UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JOEL FOWLER,                                               :

                        Plaintiff,                   :

          -against-

                                :

THE CITY OF NEW YORK;
KEVIN STUMPF, JOSEPH PERRY, and                            :
JAMES NASH, Individually and as
Members of the New York City Police Department,            :

                    Defendants.                  :

-----------------------------------------------------------------X

**COMPLAINT**

16 CV 6059

**Jury Trial Demanded**

       Plaintiff JOEL FOWLER ("Plaintiff"), by his attorneys, EMERY CELLI

BRINCKERHOFF & ABADY, LLP, and the LAW OFFICES OF JOEL B. RUDIN, P.C.,

complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

**NATURE OF ACTION**

       1.      This is a civil action, pursuant to 42 U.S.C. §1983 and 1988, and state law,

seeking monetary damages for Plaintiff, JOEL FOWLER, due to his wrongful arrest,

prosecution, conviction, and imprisonment for a murder that he did not commit.  Plaintiff's

injuries were caused by the misconduct and the wrongful policies of the Brooklyn District

Attorney's Office ("BDAO"), the New York City Police Department ("NYPD"), and their

individual employees.

       2.      Plaintiff spent nearly eight years in local and state custody, before and after his

trial and conviction, until his conviction was vacated on the motion of the BDAO's Conviction

Review Unit ("CRU").  The CRU acknowledged that the prosecution had been based upon false

1

or unreliable testimony and never should have been brought.  The CRU further admitted that Plaintiff's conviction also had been caused by the BDAO's withholding of exculpatory evidence which the United States Constitution required to be disclosed to Plaintiff and his defense counsel prior to trial.

3.      This lawsuit seeks to hold Defendant THE CITY OF NEW YORK liable for the above misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and *Monell v. Dept. Of Social Services*, 436 U.S. 658 (1978).  The unlawful actions of police detectives and prosecutors documented in this lawsuit resulted from municipal policies, practices, and customs to violate the constitutional rights of criminal suspects and defendants, and/or from deliberate indifference by policy-making officials, acting on behalf of Defendant THE CITY OF NEW YORK, to such violations.  The lawsuit also seeks to hold liable the individual police detectives whose wrongful behavior also were a direct cause of Plaintiff's injuries.

## JURISDICTION, VENUE, and CONDITIONS PRECEDENT

4.      This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

5.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

7.      On or about November 2, 2015, Plaintiff served upon Defendant THE CITY OF NEW YORK timely notice of the present claims pursuant to New York General Municipal Law § 50-e. A hearing pursuant to New York General Municipal Law § 50-h was held on November 1, 2016.

2

8.      This action has been commenced within one year and 90 days of the accrual of Plaintiff's causes of action.

9.      Plaintiff has duly complied with all of the conditions precedent to the commencement of this action.

## THE PARTIES

10.     Plaintiff, JOEL FOWLER, is a citizen of the United States, and resides within the State of New York.

11.     Defendant, THE CITY OF NEW YORK, of which the County of Kings is a subdivision, is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

12.     Defendant, KEVIN STUMPF, Tax Registration No. 902443, was at all relevant times a detective employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and THE CITY OF NEW YORK, and acted within the scope of his employment.  He is sued in his individual and his official capacities.

13.     Defendant, JOSEPH PERRY, Tax Registration No. 905404, was at all relevant times a detective employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and THE CITY OF NEW YORK, and acted within the scope of his employment.  He is sued in his individual and his official capacities.

14.     Defendant, JAMES NASH, Tax Registration No. 889123, was at all relevant times a detective employed by the NYPD, acted toward Plaintiff under color of the statutes,

3

ordinances, customs, and usage of the State of New York and THE CITY OF NEW YORK, and acted within the scope of his employment.  He is sued in his individual and his official capacities.

15.     The BDAO is an agency of THE CITY OF NEW YORK.  The District Attorney, assistants district attorney, and detective-investigators employed by the BDAO are agents and employees of Defendant THE CITY OF NEW YORK, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

16.     The NYPD is an agency of Defendant THE CITY OF NEW YORK.  Detectives and police officers employed by the NYPD are agents and employees of Defendant THE CITY OF NEW YORK, which is legally responsible for torts they commit within the scope of their employment and/or under color of law.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     The Crime and the Initial Investigation

17.     On September 10, 2007, Dwayne Smith (a.k.a. "Bundy") was shot multiple times and killed near the corner of Woodruff and Ocean Avenues in the Flatbush section of Brooklyn, New York.  Defendant STUMPF was assigned to head the investigation.

18.     Detectives, including Defendants STUMPF, PERRY and NASH, interviewed numerous eyewitnesses who saw all or part of the incident, as well as medical personnel who observed or examined the deceased.

19.     Through their investigation, detectives, including Defendants STUMPF, PERRY and NASH, learned the following:

> (a)     There was just one assailant;
>
> (b)     Smith was shot at least four times;
>
> (c)     Between four to seven shots were fired;
>
> (d)     All the shots entered Smith's body from the rear;
>
> (e)     The assailant fled the scene on foot.

20.     On or about September 17, 2007, an eyewitness identified a photograph of a police suspect named Bryan Smith as the shooter.

21.     However, following an additional investigation, the Defendants concluded that Smith was not the shooter.

22.     Based upon rumors, the Defendants identified Plaintiff as a possible suspect. Fowler was a 17-year-old high school student with no record of criminal convictions.

23.     The defendants interviewed another claimed eyewitness, Dawn Perkins.

24.     Perkins lived near to the shooting.

25.     Perkins told the Defendants that she knew the victim, Smith, that he had called to her through her window, that she had come downstairs, and that she had been a short distance behind him when she had witnessed the shooting.

26.     Perkins claimed she knew the shooter from the neighborhood as a top leader of the Crips gang known by the nickname "Too Cool."

27.     Perkins told the Defendants that she had heard just two to three shots, that she had seen Too Cool shoot the victim in the face, and that Too Cool had fled the scene in a black automobile.

28.     The defendants, however, knew from their investigation that Smith had been shot four times, and had not been shot in the face.

29.     The defendants knew as well that the shooter had not gotten into an automobile, but had fled the scene of the shooting on foot.

30.     Despite the above reasons to doubt Perkins's story, the Defendants showed Perkins a photo array.

31.     When Perkins was unsure whom to select, the Defendants falsely told her that Plaintiff's photograph had been selected by other eyewitnesses.  She then selected Plaintiff's photo.

32.     Perkins also told the Defendants that she saw the shooter, Too Cool, about four to five days after the shooting at his usual hangout spot, and then again at Smith's wake.

33.     Defendants knew, based upon other, definitive information, that Plaintiff could not possibly have been the person Perkins saw on the above two occasions following the shooting.

34.     Nevertheless, the Defendants ceased investigating any other suspects and focused on Plaintiff only, intending to arrest him.

35.     On or about January 9, 2009, at about 9:35 a.m., Defendant STUMPF was told by another police officer that he had arrested Plaintiff.

36.     The latter officer brought Plaintiff to the 70th Precinct Detective Squad, and STUMPF took custody of him at about 10 a.m.  Plaintiff had recently turned 18 years of age.

37.     At about 11 a.m., STUMPF gave Plaintiff his *Miranda* warnings, and interrogated Plaintiff.  Plaintiff denied any involvement in the shooting.

6

38.     Later that same day, Plaintiff was exhibited to at least four eyewitnesses in a lineup.

39.     Three witnesses failed to identify him as the shooter.

40.     However, Dawn Perkins identified him.

41.     Rather than take Plaintiff for processing in court, the Defendants continued to hold him alone at the precinct.

42.     Knowing that Dawn Perkins' identification alone was an insufficient basis for initiating Plaintiff's prosecution, given the circumstances, Defendants used physical and psychological coercion to get Plaintiff to make a statement implicating himself in the shooting.

43.     They physically manhandled and menaced Plaintiff and caused him to suffer an injury to his hand.

44.     They fed him details about the shooting that he could incorporate into a statement.

45.     They tried to frighten him, and to make him anxious, by, among other things, telling him falsely that several witnesses had identified him at the lineup, falsely indicating that his best friend had implicated him in the murder, telling him that he would have to take the weight for the murder unless he told them someone else was responsible and made a statement minimizing his own culpability, and refusing to comply with his request to speak with his mother and with an attorney.

46.     At approximately 11 p.m., after having been held in a precinct jail cell for more than 12 hours, Plaintiff made a further statement admitting some involvement with the deceased, but maintaining that he had no involvement in the homicide.

47.     Rather than take Plaintiff to court to be arraigned, the Defendants continued to hold him in a cell at the precinct in a manner that was calculated to make him feel that he would be held indefinitely.

48.     The next day, at about noon, after a total of nearly 27 hours in custody, Plaintiff agreed to make a further statement.

49.     This time, he told the Defendants, and then an assistant district attorney, in substance, that he was present when his friend shot the victim in a gang-related assault and that, while he handled the gun after his friend dropped it and shot it into the air, he was not the killer.

50.     The police knew this statement could not be true, as all eyewitnesses had reported that just one person had been involved in the shooting.

51.     Defendants sought and obtained the approval of the BDAO to formally arrest Plaintiff and to bring him to the Criminal Court for arraignment on a charge of murder.

52.     Defendant Stumpf formally initiated the prosecution by signing a sworn Criminal Court complaint, which the BDAO filed in court, accusing Plaintiff of the homicide.

53.     Based upon the prosecution's statement to the court about the evidence it had received from the police implicating Plaintiff in the murder, Plaintiff was detained without bail, and remained in local custody through his conviction at trial.

54.     Plaintiff was indicted by a grand jury that was deceived about the evidence against him:  Dawn Perkins's identification testimony and Plaintiff's own alleged inculpatory statements.  The grand jury was not informed that:

(a)     Perkins's identification resulted from an improperly suggestive photo identification procedure;

8

(b)     Perkins had misidentified Plaintiff as the person she saw twice after the shooting, including at the victim's wake, and thus likely had misidentified him as the shooter;

(c)     Perkins' claim that she knew the shooter as "Too Cool" was exculpatory since Plaintiff's nickname was not "Too Cool" but another man, a leader of the Crips gang, was known in the area by that name;

(d)     Perkins' claim that she saw the shooter flee the scene in an automobile was contradicted by all the other eyewitnesses;

(e)     Perkins' claim that she saw Plaintiff shoot Smith in the face was contradicted by the medical evidence;

(f)     Perkins' claim that she heard just two or three shots was contradicted by the evidence that Smith was shot four times;

(g)     At least three witnesses who viewed the lineup stated they did not recognize the shooter, which was evidence that Plaintiff was innocent; and

(h)     Plaintiff's inculpatory statements had resulted from the psychological and physical coercion described above in ¶¶ 42-50.

55.     During the trial, the main evidence against Plaintiff, as in the grand jury, was Dawn Perkins' identification testimony and Plaintiff's's own statements to police.

56.     Plaintiff testified in his own defense that another individual was known as "Too Cool".

57.     He testified that this individual came to his apartment after the shooting and tried to hide the murder weapon in Plaintiff's residence, but Plaintiff refused.

9

58.    Plaintiff also testified that the police had coerced his statement.

59.    On November 9, 2009, Plaintiff was convicted of the murder.

60.    On November 26, 2009, Plaintiff, now 20 years of age, was sentenced to serve 25 years to life in prison.

61.    He was sent upstate to serve his sentence in a maximum security prison.

62.    On December 12, 2012, Plaintiff's appeal was denied.

63.    He now faced an apparent certainty of spending most if not all of his life in prison.

**B.    Plaintiff's Conviction Is Overturned**

64.    Plaintiff's appellate attorneys, Appellate Advocates, believing in his innocence, reinvestigated his case and brought their new evidence to the Conviction Review Unit ("CRU") of the BDAO.

65.    The Unit had been formed after the defeat of District Attorney Charles J. Hynes, under whom Plaintiff had been prosecuted, and the election of a new District Attorney, Kenneth P. Thompson, who had campaigned on the issue of pervasive prosecutorial misconduct under Hynes.

66.    The CRU conducted its own investigation.

67.    On August 4, 2015, attorneys at the CRU, including the head of the unit, Mark Hale, moved to vacate Plaintiff's conviction, and to dismiss the indictment against him.

68.    Mr. Hale stated that it should have been obvious to detectives, from the beginning of the case, that Perkins' account, including her identification of Plaintiff, was contradicted by

10

other witnesses who had a better "perspective" on the incident.  He said the detectives should have realized her testimony had "fatal flaws" and was "unreliable."

69.     Based upon the CRU's formal investigative report, analysis, and recommendation, which District Attorney Thompson had approved, Mr. Hale stated, among other things, that:

    (a)    Detectives had improperly manipulated Perkins, through coercion and suggestion, to blame Plaintiff for the murder;

    (b)    The prosecutor had withheld various pieces of exculpatory evidence contradicting the prosecution's case, including:

        i.    Perkins's recantation of her identification of Plaintiff;

        ii.    Perkins' identification of another individual as Too Cool;

        iii.    Perkins' accusation that this individual had attempted to murder another person in an unrelated incident;

        iv.    Perkins's statement that she had lied about having seen this other Too Cool commit the other shooting, as she had not seen the incident at all but only had heard about it;

        v.    Perkins' refusal to testify voluntarily against Plaintiff; and

        vi.    Perkins's agreement to testify followed her being informed the trial judge had issued a material witness order authorizing her arrest and detention.

70.     Mr. Hale further stated: "[T]he People do not presently believe that Mr. Fowler was the person who shot and killed Dwayne Smith, and further there is no reasonable basis by

which the People could or should continue this indictment and this prosecution against Mr.

Fowler."

71.     The court then granted the motion to vacate the conviction, dismissed the

indictment, and released Plaintiff from custody, after he had served a total of nearly eight years

in jail or prison.

**C.     Plaintiff's Damages and Injuries**

72.     Plaintiff's injuries and damages include, but are not limited to his:

(a)     Wrongful arrest, prosecution, and conviction for murder, and sentence of
25 years to life in prison;

(b)     Actual incarceration, prior to and following trial, totaling nearly eight
years;

(c)     Physical injuries and illness, including injuries suffered during assaults by
other inmates;

(d)     Loss of the services, society, companionship, and consortium of his
parents, siblings, and friends;

(e)     Past and future mental and emotional suffering;

(f)     Past and future loss or diminution of employment earnings in an amount to
be determined;

(g)     Other items of attendant damages.

## FIRST CAUSE OF ACTION

**(Malicious Prosecution Under State Law; All
Defendants)**

73.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through

72 of this Complaint.

12

74.     By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

75.     The criminal proceedings terminated in Plaintiff's favor.

76.     There was no probable cause for the commencement or the continuation of the criminal proceedings.

77.     The Defendants acted with actual malice.

78.     Defendant THE CITY OF NEW YORK is liable under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress Under State Law; All Defendants)**

79.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 78 of this Complaint.

80.     Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff.

81.     Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, Plaintiff severe emotional distress.

82.     Specifically, defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, while acting in an investigative capacity, coerced or manipulated witnesses into making false statements to be used against Plaintiff, initiated or caused the initiation and continuation of false and unfounded

criminal charges against Plaintiff while lacking probable cause to do so, and suppressed evidence favorable to Plaintiff which he was absolutely entitled to receive under the Constitution and laws of the State of New York and of the United States.

83.     Plaintiff suffered severe emotional distress that was proximately caused by, and resulted from, the Defendants' aforementioned actions.

84.     By virtue of the foregoing, Plaintiff suffered the actual damages identified in ¶ 72.

85.     Defendant THE CITY OF NEW YORK is liable under the principle of *respondeat superior*.

### THIRD CAUSE OF ACTION

**(42 U.S.C. § 1983; Malicious Prosecution Under the Fourth, Fifth, and Fourteenth Amendments; Defendants STUMPF, PERRY and NASH)**

86.     Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1 through 85 of this Complaint.

87.     By virtue of the foregoing, Defendants STUMPF, PERRY, and NASH are liable to Plaintiff for damages, pursuant to 42 U.S.C. § 1983, for knowingly, willfully, and maliciously causing Plaintiff to be seized, prosecuted, and deprived of his liberty without probable cause, in violation of his right to be free of unreasonable search and seizure pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, and to procedural due process pursuant to the Fifth and Fourteenth Amendments.

88.     The Defendants also are liable to Plaintiff under 42 U.S.C. § 1983 for knowingly, willfully, and maliciously depriving Plaintiff of his liberty, without probable cause,  through

14

outrageous conduct that shocks the conscience, in violation of Plaintiff's right to substantive due process pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

## FOURTH CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; Defendants STUMPF, PERRY and NASH)**

89.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 88 of this Complaint.

90.     The Defendants deliberately manufactured false evidence against Plaintiff, including Dawn Perkins' identification testimony and Plaintiff's inculpatory statements.

91.     The Defendants handed Perkins' identification evidence and Plaintiff's statements to prosecutors.

92.     The Defendants did so knowing that such evidence was likely to be relied upon by the jury at trial, and in fact the evidence was relied upon by the jury, thereby proximately causing Plaintiff's conviction.

93.     In addition, the Defendants did so knowing such evidence was likely to be relied upon by the court that was responsible for setting or denying bail, by the prosecutor who decided whether to prosecute, and by the grand jury that decided whether to indict, and in fact the evidence was relied upon by these bodies, thereby proximately causing Plaintiff to be deprived of his liberty.

94.     Further, the Defendants, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the due process and fair trial provisions of the

Fifth, Sixth, and Fourteenth Amendments, had an absolute constitutional obligation to disclose to the prosecution, and to the defense, all evidence in their possession or knowledge which tended to favor Plaintiff, including, but not limited to, the manner in which they had manufactured Perkins' identification testimony and coerced Plaintiff's inculpatory statements.

95.     They knowingly, willfully, intentionally, recklessly, and/or negligently failed to disclose such evidence.

96.     The Defendants thereby violated Plaintiff's right to procedural and substantive due process and to a fair trial pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and are liable to Plaintiff for damages under 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

**(Monell/42 U.S.C. § 1983 Claim Against Defendant THE CITY OF NEW YORK for Actions of the BDAO)**

97.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 72 as if fully set forth herein.

98.     Prior to trial, the prosecutor, Assistant District Attorney Jonathan Kaye, was told by the chief witness for the prosecution, Dawn Perkins, that she had not actually seen the shooting.

99.     Perkins told ADA Kaye that she had merely heard on the street that the shooter was the gang leader, Too Cool.

100.     Meanwhile, ADA Kaye learned that, in connection with an unrelated shooting, Perkins had identified *another* individual as "Too Cool."

101.     Perkins said she had seen this man attempt to kill another man.

16

102.    Kaye learned further that Perkins had then admitted to the D.A.'s Office – as she admitted to Kaye in this case – that she had not seen the shooting at all.

103.    Perkins admitted that she had merely *heard on the street* that Too Cool was the shooter.  This admission forced the D.A.'s Office to dismiss the attempted murder case against the real Too Cool.

104.    Having recanted her testimony against Plaintiff, Perkins then refused to testify.

105.    With Perkins being the only witness who identified Plaintiff as the shooter, Perkins' recantation threatened the viability of the prosecution.

106.    Instead of accepting what Perkins now said was the truth, Kaye obtained a material witness order authorizing Perkins to be arrested and detained until she completed her testimony.

107.    Additionally, before "agreeing" to testify, Perkins requested, and the D.A.'s Office promised, that she would receive relocation and other assistance if she testified against Plaintiff.

108.    ADA Kaye was required, under *Brady v. Maryland*, *Giglio v. United States*, additional state and federal case law, and New York attorney ethical rules to disclose to the defense the exculpatory as well as the impeachment information set forth in ¶¶ 89-107.

109.    Indeed, the evidence was especially crucial because it directly supported Plaintiff's own testimony that the real Too Cool had admitted to him that he shot Smith.

110.    Nevertheless, in violation of constitutional requirements guaranteeing Plaintiff a right to due process and a fair trial, Kaye withheld all this evidence and information from the defense.

17

111.    At the same time, he misled the jury by presenting Perkins as a truthful witness with no reason to lie and trying to discredit Plaintiff's own testimony that the real Too Cool was the Smith's killer.

112.    Indeed, during his summation, ADA Kaye further violated Plaintiff's constitutional right to due process and a fair trial by arguing, falsely, among other things, that Ms. Perkins had no conceivable reason to lie at trial and that she had never varied in her claim that Plaintiff was the shooter.

113.    But for ADA Kaye's misconduct in withholding *Brady* material and knowingly misleading the jury in his examination of witnesses and in his summation, Plaintiff would not have been convicted.

114.    At the time of Plaintiff's trial, and continuing through December 31, 2013, the Brooklyn District Attorney was Charles J. Hynes.

115.    Hynes had been District Attorney since January 1, 1990.

116.    Hynes was an employee of Defendant THE CITY OF NEW YORK, and the District Attorney's Office he headed was, and is, an agency of Defendant THE CITY OF NEW YORK.

117.    Hynes was the highest ranking New York City official with responsibility for setting and enforcing policy with respect to managing his Office's personnel and the functions of the Office, and had final policymaking authority in all such areas.

118.    In his policymaking role on behalf of his employer, the Defendant THE CITY OF NEW YORK, Hynes maintained a policy, custom and/or practice (the "Hynes Policy")  of deliberate indifference to violations by his employees of the constitutional rights to due process

18

and a fair trial, under the Fifth, Sixth, and Fourteenth Amendments to the United States

Constitution, of individuals who were investigated and criminally prosecuted in Kings County

These violations included, among other things:

    (a)    the knowing or reckless use of, reliance upon, and failure to correct false, misleading, or inflammatory evidence and argument;

    (b)    the improper manipulation of witnesses, and creation of false or inherently unreliable testimony, through physical and psychological coercion, threats, unlawful detentions, and promises of rewards;

    (c)    the toleration of such illegal tactics by police; and

    (d)    the withholding from criminal defendants of evidence favorable to them and required to be disclosed under *Brady v. Maryland* and its progeny.

119.    The Hynes Policy began with his induction as District Attorney and continued until the day he left office.

120.    The Hynes Policy caused Hynes' subordinate, ADA Kaye, to violate Plaintiff's rights and was a proximate cause of Plaintiff's conviction.

121.    In literally dozens of cases handled by Hynes' office, either on trial or appeal or both, courts have found that prosecutors engaged in the types of misconduct enumerated above in ¶ 118.

122.    Nevertheless, Hynes and his staff, pursuant to the Hynes Policy, defended such misconduct, took no disciplinary or remedial actions against the individual offenders, failed to report the offenders to outside attorney disciplinary bodies, and failed to take reasonable steps to ensure that prosecutors were properly trained and supervised in such areas and would not repeat such behavior.

123.    Hynes and his top administrators have admitted in sworn depositions that the Office under Hynes had no formal disciplinary system for investigating or disciplining prosecutors who violated the rights of criminal defendants, including no formal procedures and no formal standards for when to impose discipline.

124.    They have testified that the Office's informal disciplinary "procedure" was for Hynes himself to initiate disciplinary investigations when he learned of possible misconduct, and to decide, after such an investigation, whether to impose any form of punishment.

125.    Indeed, Hynes and his managerial staff were aware of dozens of cases of misconduct of the type that occurred in this case:  misleading juries, improperly coercing witnesses and criminal suspects, and intentionally, recklessly, or negligently withholding *Brady* material.

126.    Yet he rarely if ever authorized an investigation, and rarely if ever imposed any form of discipline, on the prosecutors alleged to have engaged in such misconduct.

127.    Rather, Office personnel records show that Hynes and his managerial staff almost invariably gave good evaluations, recommendations, promotions, and pay raises to prosecutors they knew had been alleged or found to have engaged in such  misconduct, and ratified the misconduct by defending it even after it was exposed.

128.    Through his policy of deliberate indifference, Hynes created a permissive, "anything goes" atmosphere that directly led to additional such violations, including the violations in this case, all of which were reasonably foreseeable to him.[1]

---

[1]The existence in Brooklyn of dozens of cases of prosecutorial misconduct (*Brady* violations, reliance on and failure to correct false, misleading or inflammatory evidence or

129.    The Hynes Policy was implemented by policymaking officials for the Defendant

City, including, but not limited to, District Attorney Hynes and his delegates, who knew:

(a)    to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)    that such issues either present employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of employees mishandling such situations as well as the incentives that employees have to make the wrong choice; and

(c)    that the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury.

130.    The aforementioned policymaking officials had the knowledge alleged in the

preceding paragraph, based upon, among other circumstances:

(a)    as noted above, numerous credible allegations, many substantiated by judicial decisions, that Assistant District Attorneys under Hynes' ultimate

---

argument, and coercion of false or unreliable testimony from witnesses), the lack of any adequate disciplinary policy or procedure, and the failure to discipline offending prosecutors, has been documented in several federal civil rights cases brought against the City of New York for misconduct by prosecutors employed by the BDAO.  *See, e.g., Zahrey v. City of New York, et al.,* No. 98 CV 4546, 2009 WL 1024261 (S.D.N.Y. Apr. 15, 2009) (DCP)(JCF); *Leka v. City of New York*, No. 04 CV 8784, 2006 WL 2819621 (S.D.N.Y. Sept. 29, 2006) (DAB); *Collins v. City of New York*, 923 F. Supp. 2d 462 (E.D.N.Y. 2013) (FB)(RML).  In *Collins*, Judge Block upheld *Monell* claims virtually identical to the claim in this case.  *See Collins*, *supra*.  In the above cases, especially in the Collins case, extensive documentary discovery and depositions of Hynes and all of his top deputies produced extensive evidence supporting the allegations in those lawsuits, identical to those in this case, of the Hynes Policy of deliberate indifference to *Brady* violations, use of false evidence, and witness coercion.  Ultimately, in the *Collins* case, the City of New York agreed to a $10 million settlement in 2014; *Leka* was settled in 2008 for $3.1 million, and Zahrey, in 2009, for $2.25 million in damages and fees.  The Office's deliberately indifferent disciplinary practices were documented in Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors will be Disciplined by their Offices or the Bar: Three Case Studies that Prove that Assumption Wrong*, 80 FORDHAM L. REV. 537 (2011), which was published before the extensive, additional disclosures occurred in the *Collins* case.

supervision had wrongfully withheld, lost, or destroyed evidence favorable to the defense that they were required to timely disclose to the defense under *Brady*, had presented or failed to correct false or misleading testimony and argument, and/or had coerced false or inherently unreliable statements or testimony from witnesses, including criminal suspects;

(b)     civil lawsuits, some of which resulted in substantial civil settlements, alleging that ADAs had falsified, exaggerated, or withheld evidence, thereby wrongfully injuring individuals suspected or accused of crime;

(c)     numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Divisions, discussing the difficult issues that regularly arise under the *Brady* rule and the failures of New York City or Brooklyn prosecutors to comply with that rule;

(d)     judicial decisions putting the Kings County District Attorney on notice that the City could be held liable for its failure to adequately train, supervise, or discipline ADAs regarding their *Brady* and related due process obligations, *see, e.g., Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992); *Ramos v. City of New York*, 285 A.D.2d 284,  301-07 (1st Dep't 2001);

(e)     the inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the inherent pressure on prosecutors to obtain convictions.

131.     Despite this knowledge, the supervisory and policymaking officers and officials of the Defendant THE CITY OF NEW YORK perpetuated, or failed to take preventative or remedial measures to terminate, said policies, procedures, regulations, practices and/or customs, did not effectively instruct, train, and/or supervise and discipline their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, had no employee handbook or other published practices, policies or procedures for investigating and disciplining prosecutors who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who

engaged in such practices, but instead sanctioned or tolerated the policies, procedures,

regulations, practices and/or customs, described above, with deliberate indifference to the effect

of said policies, procedures, regulations, practices and/or customs upon the constitutional rights

of residents and citizens of the City and the State of New York.

132.   The aforesaid policies, procedures, regulations, practices, and/or customs of

Defendant THE CITY OF NEW YORK were collectively and individually a substantial factor in

bringing about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of

the United States, in perpetuating those violations, and in causing his damages.

133.   Under the principles of municipal liability for federal civil rights violations, the

District Attorney of Kings County (or his authorized delegates) had and has final managerial

responsibility for training, instructing, supervising and disciplining attorneys and other

employees in his office regarding their conduct as employees of the District Attorney's Office

and Defendant THE CITY OF NEW YORK, including, but not limited to, their obligations not

to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of

exculpatory evidence or *Brady* material to the defense, and to refrain from offering, and to

correct,  false or misleading evidence, testimony, and argument during pretrial, trial, and post-

trial proceedings.

134.   The Kings County District Attorney, personally and/or through his authorized

delegates, at all relevant times had final authority to promulgate and implement administrative

and managerial policies and procedures, including policies and procedures as to personnel hiring,

training, supervision and discipline, with respect to his Office's performance of its duties.

23

135.   The District Attorney of Kings County at all relevant times was an elected officer of Kings County, one of the constituent counties of Defendant THE CITY OF NEW YORK, and the Office was almost entirely funded out of the City's budget, and the Office's personnel management and administrative policies were subject through the budgetary process to substantial influence by other bodies of City government including the Mayor's Office and the City Council.

136.   Furthermore, the District Attorney was designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including Kings County), and hence Defendant THE CITY OF NEW YORK itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

137.   Then District Attorney Hynes, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom Defendant THE CITY OF NEW YORK is liable, with respect to the above-mentioned functions.

138.   During all times material to this Complaint, Defendant THE CITY OF NEW YORK, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

139.    By virtue of the foregoing, Defendant THE CITY OF NEW YORK is liable for

having substantially and proximately caused the foregoing violations of Plaintiff's constitutional

rights and his resultant injuries.

### SIXTH CAUSE OF ACTION

**(Negligent Hiring, Training and Supervision Under State Law; Defendant THE CITY OF NEW YORK)**

140.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through

139 of this Complaint.

141.    By virtue of the foregoing, Defendant THE CITY OF NEW YORK is liable to

Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent

failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees

employed by the BDAO and/or the NYPD with regard to their aforementioned duties.

### DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.      For compensatory damages of not less than $10 million;

b.      For punitive damages against the individual Defendants of $5 million;

c.      For reasonable attorneys' fees, together with costs and disbursements, pursuant to

        42 U.S.C. §1988 and to the inherent powers of this Court;

d.      For pre-judgment interest as allowed by law; and

e.      For such other and further relief as this Court may deem just and proper.

Dated:       New York, New York
             November 1, 2016

                          LAW OFFICES OF JOEL B. RUDIN, P.C.

                          BY: JOEL B. RUDIN, ESQ.
                          600 Fifth Avenue, 10th Floor
                          New York, New York 10020
                          (212) 752-7600
                          Email: jbrudin@rudinlaw.com


                          EMERY CELLI  BRINCKERHOFF
                              & ABADY, LLP

                          BY: EARL WARD, ESQ.
                          600 Fifth Avenue, 10th Floor
                          (212) 763-5000
                          Email: eward@ecbalaw.com

                          *ATTORNEYS FOR THE PLAINTIFF*