UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JOEL FOWLER

              Plaintiff,

   v.

THE CITY OF NEW YORK; KEVIN STUMPF;
JOSEPH PERRY; and JAMES NASH,
Individually and as Members of the New York
City Police Department,

              Defendants.

No. 16 Civ. 6059

**<u>AMENDED COMPLAINT</u>**

<u>Jury Trial Demanded</u>

Plaintiff JOEL FOWLER ("Plaintiff"), by his attorneys, EMERY CELLI

BRINCKERHOFF & ABADY, LLP, and the LAW OFFICES OF JOEL B. RUDIN, P.C.,

complaining of the Defendants, respectfully alleges, upon information and belief, as follows:

<u>**NATURE OF ACTION**</u>

1.      This is a civil action, pursuant to 42 U.S.C. §1983 and 1988, and state law,

seeking monetary damages for Plaintiff, JOEL FOWLER, due to his wrongful arrest,

prosecution, conviction, and imprisonment for a murder that he did not commit.  Plaintiff's

injuries were caused by the misconduct and the wrongful policies of the Kings County District

Attorney's Office ("KCDAO"), the New York City Police Department ("NYPD"), and their

individual employees.

2.      Plaintiff spent nearly eight years in local and state custody, before and after his

trial and conviction, until his conviction was vacated on the motion of the KCDAO's Conviction

Review Unit ("CRU").  The CRU acknowledged that the prosecution had been based upon false

or unreliable testimony and never should have been brought.  The CRU further admitted that Plaintiff's conviction also had been caused by the KCDAO's withholding of exculpatory evidence which the United States Constitution required to be disclosed to Plaintiff and his defense counsel prior to trial.

3.      This lawsuit seeks to hold Defendant THE CITY OF NEW YORK liable for the above misconduct under the federal civil rights statute, 42 U.S.C. § 1983, and *Monell v. Dep't Of Social Services*, 436 U.S. 658 (1978).  The unlawful actions of police detectives and prosecutors documented in this lawsuit resulted from municipal policies, practices, and customs to violate the constitutional rights of criminal suspects and defendants, and/or from deliberate indifference by policy-making officials, acting on behalf of Defendant THE CITY OF NEW YORK, to such violations.  The lawsuit also seeks to hold liable the individual police detectives whose wrongful behavior also was a direct cause of Plaintiff's injuries.

## JURISDICTION, VENUE, and CONDITIONS PRECEDENT

4.      This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

5.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

7.      On or about November 2, 2015, Plaintiff served upon Defendant THE CITY OF NEW YORK timely notice of the present claims pursuant to New York General Municipal Law § 50-e. A hearing pursuant to New York General Municipal Law § 50-h was held on November 1, 2016.

2

8.     This action has been commenced within one year and 90 days of the accrual of

Plaintiff's causes of action.

9.     Plaintiff has duly complied with all of the conditions precedent to the

commencement of this action.

**THE PARTIES**

10.     Plaintiff JOEL FOWLER, is a citizen of the United States, and resides within the

State of New York.

11.     Defendant THE CITY OF NEW YORK ("City"), of which the County of Kings is

a subdivision, is a municipal corporation of the State of New York and is a resident of the

Eastern District of New York. The KCDAO is an agency of THE CITY OF NEW YORK.  The

District Attorney, assistants district attorney, and detective-investigators employed by the

KCDAO are agents and employees of Defendant THE CITY OF NEW YORK, which is legally

responsible for torts they commit within the scope of their employment and/or under color of

law. The NYPD is an agency of Defendant THE CITY OF NEW YORK.  Detectives and police

officers employed by the NYPD are agents and employees of Defendant THE CITY OF NEW

YORK, which is legally responsible for torts they commit within the scope of their employment

and/or under color of law.

12.     Defendant KEVIN STUMPF, Tax Registration No. 902443, was at all relevant

times a detective employed by the NYPD, acted toward Plaintiff under color of the statutes,

ordinances, customs, and usage of the State of New York and THE CITY OF NEW YORK, and

acted within the scope of his employment.  He is sued in his individual and his official

capacities.

3

13.     Defendant JOSEPH PERRY, Tax Registration No. 905404, was at all relevant times a detective employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and THE CITY OF NEW YORK, and acted within the scope of his employment.  He is sued in his individual and his official capacities.

14.     Defendant JAMES NASH, Tax Registration No. 889123, was at all relevant times a detective employed by the NYPD, acted toward Plaintiff under color of the statutes, ordinances, customs, and usage of the State of New York and THE CITY OF NEW YORK, and acted within the scope of his employment.  He is sued in his individual and his official capacities.

15.     Defendants Stumpf, Perry, and Nash will be referred to herein as "the Individual Defendants."

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.     The Crime and the Initial Investigation

16.     On September 10, 2007, Dwayne Smith (a.k.a. "Bundy") was shot multiple times and killed near the corner of Woodruff and Ocean Avenues in the Flatbush section of Brooklyn, New York.  Defendant STUMPF was assigned to head the investigation.

17.     Detectives, including Defendants STUMPF, PERRY, and NASH, interviewed numerous eyewitnesses who saw all or part of the incident, as well as medical personnel who observed or examined the deceased.

18.     Through their investigation, detectives, including Defendants STUMPF, PERRY and NASH, learned the following:

     (a)     There was just one assailant;

     (b)     Smith was shot at least four times;

     (c)     Between four to seven shots were fired;

     (d)     All the shots entered Smith's body from the rear;

     (e)     The assailant fled the scene on foot.

19.     On or about September 17, 2007, an eyewitness identified a photograph of a police suspect (not Plaintiff) as the shooter.

20.     However, following an additional investigation, the Individual Defendants concluded that this suspect was not the shooter.

21.     A witness to the murder told NASH that the murder had been committed by a single gunman who was roughly 30 years old.

22.     Based upon rumors, the Individual Defendants identified Plaintiff as a possible suspect. Fowler was a 17-year-old high school student with no record of criminal convictions.

23.     Defendants STUMPF and NASH interviewed another claimed eyewitness, Dawn Perkins.

24.     Perkins lived near to the shooting.

25.     Perkins told STUMPF and NASH that she knew the victim, Smith, that he had called to her through her window, that she had come downstairs, and that she had been a short distance behind him when she had witnessed the shooting.

26.     Perkins claimed she knew the shooter from the neighborhood as a top leader of the Crips gang known by the nickname "Too Cool."

27.     Perkins told STUMPF and PERRY that she had heard just two to three shots, that she had seen Too Cool shoot the victim in the face, and that Too Cool had fled the scene in a black automobile.

28.     The Individual Defendants, however, knew from their investigation that Smith had been shot four times, and had not been shot in the face.

29.     The Individual Defendants knew as well that the shooter had not gotten into an automobile, but had fled the scene of the shooting on foot.

30.     Despite the above reasons to doubt Perkins' story, STUMPF showed Perkins a photo array.

31.     When Perkins was unsure whom to select, STUMPF falsely told her that Plaintiff's photograph had been selected by other eyewitnesses.  She then selected Plaintiff's photo.

32.     Perkins also told STUMPF and NASH that she saw the shooter, Too Cool, about four to five days after the shooting at his usual hangout spot, and then again at Smith's wake.

33.     Another witness told NASH that Plaintiff's nickname was "Scrappy" and that he had no conflicts with the murder victim.

34.     The Individual Defendants knew, based upon other, definitive information, that Plaintiff could not possibly have been the person Perkins saw on the above two occasions following the shooting.

35.     Nevertheless, the Individual Defendants ceased investigating any other suspects and focused on Plaintiff only, intending to arrest him.

6

36.     On or about January 9, 2008, at about 9:35 a.m., Defendant STUMPF was told by another police officer that he had arrested Plaintiff.

37.     The latter officer brought Plaintiff to the 70th Precinct Detective Squad, and STUMPF took custody of him at about 10 a.m.  Plaintiff had recently turned 18 years of age.

38.     At about 11 a.m., STUMPF gave Plaintiff his *Miranda* warnings, and interrogated Plaintiff.  Plaintiff denied any involvement in the shooting.

39.     Later that same day, Plaintiff was exhibited to at least four eyewitnesses in a lineup.

40.     Three witnesses failed to identify him as the shooter.

41.     However, Dawn Perkins identified him.

42.     Rather than take Plaintiff for processing in court, the Individual Defendants continued to hold him alone at the precinct.

43.     Knowing that Dawn Perkins' identification alone was an insufficient basis for initiating Plaintiff's prosecution, given the circumstances, STUMPF and PERRY used physical and psychological coercion to get Plaintiff to make a statement implicating himself in the shooting.

44.     PERRY physically manhandled and menaced Plaintiff and caused him to suffer an injury to his hand. Specifically, PERRY grabbed Plaintiff by the shirt and threw him back down on his chair.

45.     STUMPF and PERRY fed him details about the shooting that he could incorporate into a statement.

7

46.     STUMPF and PERRY tried to frighten him, and to make him anxious, by, among other things, telling him falsely that several witnesses had identified him at the lineup, falsely indicating that his best friend had implicated him in the murder, telling him that he would have to take the weight for the murder unless he told them someone else was responsible and made a statement minimizing his own culpability, and refusing to comply with his request to speak with his mother and with an attorney.

47.     At approximately 11 p.m., after having been held in a precinct jail cell for more than 12 hours, Plaintiff made a further statement admitting some involvement with the deceased, but maintaining that he had no involvement in the homicide.

48.     Rather than take Plaintiff to court to be arraigned, the Individual Defendants continued to hold him in a cell at the precinct in a manner that was calculated to make him feel that he would be held indefinitely.

49.     The next day, at about noon, after a total of nearly 27 hours in custody, Plaintiff agreed to make a further statement.

50.     This time, he told the Individual Defendants, and then an assistant district attorney, in substance, that he was present when his friend shot the victim in a gang-related assault and that, while he handled the gun after his friend dropped it and shot it into the air, he was not the killer.

51.     The Individual Defendants knew this statement could not be true, as all eyewitnesses had reported that just one person had been involved in the shooting.

8

52.     The Individual Defendants sought and obtained the approval of the KCDAO to formally arrest Plaintiff and to bring him to the Criminal Court for arraignment on a charge of murder.

53.     Defendant STUMPF formally initiated the prosecution by signing a sworn Criminal Court complaint, which the KCDAO filed in court, accusing Plaintiff of the homicide.

54.     Based upon the prosecution's statement to the court about the evidence it had received from the police implicating Plaintiff in the murder, Plaintiff was detained without bail, and remained in local custody through his conviction at trial.

55.     Plaintiff was indicted by a grand jury that was deceived about the evidence against him:  Dawn Perkins' identification testimony and Plaintiff's own alleged inculpatory statements.  The grand jury was not informed that:

(a)     Perkins' identification resulted from an improperly suggestive photo identification procedure;

(b)     Perkins had misidentified Plaintiff as the person she saw twice after the shooting, including at the victim's wake, and thus likely had misidentified him as the shooter;

(c)     Perkins' claim that she knew the shooter as "Too Cool" was exculpatory since Plaintiff's nickname was not "Too Cool" but another man, a leader of the Crips gang, was known in the area by that name;

(d)     Perkins' claim that she saw the shooter flee the scene in an automobile was contradicted by all the other eyewitnesses;

9

(e)     Perkins' claim that she saw Plaintiff shoot Smith in the face was contradicted by the medical evidence;

(f)     Perkins' claim that she heard just two or three shots was contradicted by the evidence that Smith was shot four times;

(g)     At least three witnesses who viewed the lineup stated they did not recognize the shooter, which was evidence that Plaintiff was innocent; and

(h)     Plaintiff's inculpatory statements had resulted from the psychological and physical coercion described above in ¶¶ 42-50.

56.     During the trial, the main evidence against Plaintiff, as in the grand jury, was Dawn Perkins' identification testimony and Plaintiff's own statements to police.

57.     Plaintiff testified in his own defense that another individual was known as "Too Cool".

58.     He testified that this individual came to his apartment after the shooting and tried to hide the murder weapon in Plaintiff's residence, but Plaintiff refused.

59.     Plaintiff also testified that the police had coerced his statement.

60.     On November 9, 2009, Plaintiff was convicted of the murder.

61.     On November 26, 2009, Plaintiff, now 20 years of age, was sentenced to serve 25 years to life in prison.

62.     He was sent upstate to serve his sentence in a maximum security prison.

63.     On December 12, 2012, Plaintiff's appeal was denied.

64.     He now faced an apparent certainty of spending most if not all of his life in prison.

10

**B.**     **Plaintiff's Conviction Is Overturned**

65.     Plaintiff's appellate attorneys, Appellate Advocates, believing in his innocence, reinvestigated his case and brought their new evidence to the Conviction Review Unit ("CRU") of the KCDAO.

66.     The Unit had been formed after the defeat of District Attorney Charles J. Hynes, under whom Plaintiff had been prosecuted, and the election of a new District Attorney, Kenneth P. Thompson, who had campaigned on the issue of pervasive prosecutorial misconduct under Hynes.

67.     The CRU conducted its own investigation.

68.     On August 4, 2015, attorneys at the CRU, including the head of the unit, Mark Hale, moved to vacate Plaintiff's conviction, and to dismiss the indictment against him.

69.     Mr. Hale stated that it should have been obvious to detectives, from the beginning of the case, that Perkins' account, including her identification of Plaintiff, was contradicted by other witnesses who had a better "perspective" on the incident.  He said the detectives should have realized her testimony had "fatal flaws" and was "unreliable."

70.     Based upon the CRU's formal investigative report, analysis, and recommendation, which District Attorney Thompson had approved, Mr. Hale stated, among other things, that:

> (a)     Detectives had improperly manipulated Perkins, through coercion and suggestion, to blame Plaintiff for the murder;
>
> (b)     The prosecutor had withheld various pieces of exculpatory evidence contradicting the prosecution's case, including:
>
>> i.     Perkins' recantation of her identification of Plaintiff;

      ii.      Perkins' identification of another individual as Too Cool;

      iii.     Perkins' accusation that this individual had attempted to murder another person in an unrelated incident;

      iv.     Perkins' statement that she had lied about having seen this other Too Cool commit the other shooting, as she had not seen the incident at all but only had heard about it;

      v.      Perkins' refusal to testify voluntarily against Plaintiff; and

      vi.     Perkins' agreement to testify followed her being informed the trial judge had issued a material witness order authorizing her arrest and detention.

71.     Mr. Hale further stated: "[T]he People do not presently believe that Mr. Fowler was the person who shot and killed Dwayne Smith, and further there is no reasonable basis by which the People could or should continue this indictment and this prosecution against Mr. Fowler."

72.     The court then granted the motion to vacate the conviction, dismissed the indictment, and released Plaintiff from custody, after he had served a total of nearly eight years in jail or prison.

**C.**     **Plaintiff's Damages and Injuries**

73.     Plaintiff's injuries and damages include, but are not limited to his:

      (a)     Wrongful arrest, prosecution, and conviction for murder, and sentence of 25 years to life in prison;

      (b)     Actual incarceration, prior to and following trial, totaling nearly eight years;

     (c)      Physical injuries and illness, including injuries suffered during assaults by other inmates;

     (d)      Loss of the services, society, companionship, and consortium of his parents, siblings, and friends;

     (e)      Past and future mental and emotional suffering;

     (f)      Past and future loss or diminution of employment earnings in an amount to be determined;

     (g)      Other items of attendant damages.

## FIRST CAUSE OF ACTION
### (Malicious Prosecution Under State Law; Against All Defendants)

74.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 73 of this Complaint.

75.     By virtue of the foregoing, the Individual Defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

76.     The criminal proceedings terminated in Plaintiff's favor.

77.     There was no probable cause for the commencement or the continuation of the criminal proceedings.

78.     The Defendants acted with actual malice.

79.     Defendant THE CITY OF NEW YORK is liable under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress Under State Law; Against All Defendants)

80.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 79 of this Complaint.

81.     The Individual Defendants engaged in a continuous pattern of extreme and outrageous conduct directed at Plaintiff.

82.     The Individual Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, Plaintiff severe emotional distress.

83.     Specifically, the Individual Defendants, individually, in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, while acting in an investigative capacity, coerced or manipulated witnesses into making false statements to be used against Plaintiff, initiated or caused the initiation and continuation of false and unfounded criminal charges against Plaintiff while lacking probable cause to do so, and suppressed evidence favorable to Plaintiff which he was absolutely entitled to receive under the Constitution and laws of the State of New York and of the United States.

84.     Plaintiff suffered severe emotional distress that was proximately caused by, and resulted from, the Individual Defendants' aforementioned actions.

85.     By virtue of the foregoing, Plaintiff suffered the actual damages identified in ¶ 73.

86.     Defendant THE CITY OF NEW YORK is liable under the principle of *respondeat superior*.

## <u>THIRD CAUSE OF ACTION</u>
**(42 U.S.C. § 1983; Malicious Prosecution Under the Fourth, Fifth, and Fourteenth Amendments; Against Defendants STUMPF, PERRY, and NASH)**

87.     Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1 through 86 of this Complaint.

14

88.     By virtue of the foregoing, Defendants STUMPF, PERRY, and NASH are liable to Plaintiff for damages, pursuant to 42 U.S.C. § 1983, for knowingly, willfully, and maliciously causing Plaintiff to be seized, prosecuted, and deprived of his liberty without probable cause, in violation of his right to be free of unreasonable search and seizure pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, and to procedural due process pursuant to the Fifth and Fourteenth Amendments.

89.     The Individual Defendants also are liable to Plaintiff under 42 U.S.C. § 1983 for knowingly, willfully, and maliciously depriving Plaintiff of his liberty, without probable cause, through outrageous conduct that shocks the conscience, in violation of Plaintiff's right to substantive due process pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

### FOURTH CAUSE OF ACTION
**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; Against Defendants STUMPF, PERRY, and NASH)**

90.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 89 of this Complaint.

91.     The Individual Defendants deliberately manufactured false evidence against Plaintiff, including Dawn Perkins' identification testimony and Plaintiff's inculpatory statements.

92.     The Individual Defendants handed Perkins' identification evidence and Plaintiff's statements to prosecutors.

93.    The Individual Defendants did so knowing that such evidence was likely to be relied upon by the jury at trial, and in fact the evidence was relied upon by the jury, thereby proximately causing Plaintiff's conviction.

94.    In addition, the Individual Defendants did so knowing such evidence was likely to be relied upon by the court that was responsible for setting or denying bail, by the prosecutor who decided whether to prosecute, and by the grand jury that decided whether to indict, and in fact the evidence was relied upon by these bodies, thereby proximately causing Plaintiff to be deprived of his liberty.

95.    Further, the Individual Defendants, pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the due process and fair trial provisions of the Fifth, Sixth, and Fourteenth Amendments, had an absolute constitutional obligation to disclose to the prosecution, and to the defense, all evidence in their possession or knowledge which tended to favor Plaintiff, including, but not limited to, the manner in which they had manufactured Perkins' identification testimony and coerced Plaintiff's inculpatory statements.

96.    They knowingly, willfully, intentionally, recklessly, and/or negligently failed to disclose such evidence.

97.    The Individual Defendants thereby violated Plaintiff's right to procedural and substantive due process and to a fair trial pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and are liable to Plaintiff for damages under 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION
### (Monell/42 U.S.C. § 1983 Claim; Against Defendant THE CITY OF NEW YORK)

98.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 97 as if fully set forth herein.

99.     Prior to trial, the prosecutor, Assistant District Attorney Jonathan Kaye, was told by the chief witness for the prosecution, Dawn Perkins, that she had not actually seen the Smith shooting.

100.    Perkins told ADA Kaye that she had merely heard on the street that the shooter was the gang leader, Too Cool.

101.    Meanwhile, ADA Kaye learned that, in connection with an unrelated earlier shooting, Perkins had identified *another* individual as Too Cool.  Perkins said she had seen this man attempt to kill another man.

102.    ADA Kaye learned further that Perkins had then admitted to the KCDAO —as she admitted to ADA Kaye in this case—that she had not seen that shooting at all.  Rather,

103.    Perkins admitted that she had merely *heard on the street* that Too Cool was the shooter in that earlier attempted murder.  This admission forced the KCDAO to dismiss the attempted murder case against the real Too Cool.

104.    Having recanted her testimony against Plaintiff in the Smith shooting, Perkins then refused to testify at Plaintiff's trial.

105.    Perkins was the only witness who identified Plaintiff as the shooter.

106.    To compel her testimony, ADA Kaye obtained a material witness order authorizing Perkins to be arrested and detained until she completed her testimony.

17

107.     Additionally, before "agreeing" to testify under the compulsion of the material witness order, Perkins requested, and the KCDAO promised, that she would receive relocation and other assistance if she testified against Plaintiff.

108.     ADA Kaye was required, under *Brady v. Maryland*, *Giglio v. United States*, the New York State Constitution, the New York Criminal Procedure Law, state and federal case law, and New York attorney ethical rules to disclose to the defense the exculpatory as well as the impeachment information set forth above.

109.     This evidence was especially crucial because it directly supported Plaintiff's own testimony that the real Too Cool had admitted to him that he (Too Cool) shot Smith.

110.     Nevertheless, in violation of constitutional requirements guaranteeing Plaintiff a right to due process and a fair trial, ADA Kaye withheld all this evidence and information from the defense.

111.     At the same time, he misled the jury by presenting Perkins as a truthful and voluntary witness who had no reason to lie and trying to discredit Plaintiff's own testimony that the real Too Cool was Smith's killer.

112.     During his summation, ADA Kaye further violated Plaintiff's constitutional right to due process and a fair trial by arguing, falsely, among other things, that Ms. Perkins had no conceivable reason to lie at trial and that she had never varied in her claim that Plaintiff was the shooter.

113.     But for ADA Kaye's misconduct in withholding *Brady* material and knowingly misleading the jury in his examination of witnesses and in his summation, Plaintiff would not have been convicted.

18

114.    At the time of Plaintiff's trial, and continuing through December 31, 2013, the Kings County District Attorney was Charles J. Hynes.

115.    Hynes had been the Kings County District Attorney since January 1, 1990.

116.    Hynes was an employee of Defendant THE CITY OF NEW YORK, and the District Attorney's Office he headed was, and is, an agency of Defendant THE CITY OF NEW YORK.

117.    Hynes was the highest ranking New York City official with responsibility for setting and enforcing policy with respect to managing his Office's personnel and the functions of the Office, and had final policymaking authority in all such areas.

118.    Under the principles of municipal liability for federal civil rights violations, the Kings County District Attorney (or his authorized delegates) had and has final managerial responsibility for training, instructing, supervising and disciplining attorneys and other employees in his office regarding their conduct as employees of the District Attorney's Office and Defendant THE CITY OF NEW YORK, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," to make timely disclosure of exculpatory evidence or *Brady* material to the defense, and to refrain from offering, and to correct, false or misleading evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

119.    The Kings County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his Office's performance of its duties.

19

120.     The Kings County District Attorney at all relevant times was an elected officer of Kings County, one of the constituent counties of Defendant THE CITY OF NEW YORK.  The Office was almost entirely funded out of the City's budget, and the Office's personnel management and administrative policies were subject through the budgetary process to substantial influence by other bodies of City government including the Mayor's Office and the City Council.

121.     Furthermore, the District Attorney was designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2); and New York has provided by statute (N.Y. County Law §§ 53, 941) that the City's constituent counties (including Kings County), and hence Defendant THE CITY OF NEW YORK itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

122.     Then Kings County District Attorney Hynes, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom Defendant THE CITY OF NEW YORK is liable, with respect to the above-mentioned functions.

123.     During all times material to this Complaint, Defendant THE CITY OF NEW YORK, through its policymakers, owed a duty to the public at large and to Plaintiff, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

20

124.      In his policymaking role on behalf of his employer, Defendant THE CITY OF NEW YORK, Hynes maintained a policy, custom and/or practice (the "Hynes Policy") of deliberate indifference to violations by his employees of the constitutional rights to due process and a fair trial, under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, of individuals who were investigated and criminally prosecuted in Kings County. These violations included, among other things:

> (a)      the knowing or reckless use of, reliance upon, and failure to correct false, misleading, or inflammatory evidence and argument;
>
> (b)      the improper manipulation of witnesses, and creation of false or inherently unreliable testimony, through physical and psychological coercion, including the misuse of material witness orders, threats, unlawful detentions, and promises of rewards;
>
> (c)      the toleration of such illegal tactics by police; and
>
> (d)      the withholding from criminal defendants of evidence favorable to them and required to be disclosed under *Brady v. Maryland* and its progeny through, among other things, training prosecutors not to take notes recording such information with the knowledge that a no-notes policy would cause such information to be overlooked or more easily withheld.

125.      The Hynes Policy began with his induction as the Kings County District Attorney and continued until the day he left office.

126.      The Hynes Policy caused Hynes' subordinate, ADA Kaye, to violate Plaintiff's rights and was a proximate cause of Plaintiff's conviction.

127.      In literally dozens of cases handled by Hynes' office, either at trial, on appeal, or collateral attack, courts found that prosecutors engaged in the types of misconduct enumerated above in ¶ 124.

128.      Nevertheless, Hynes and his staff, pursuant to the Hynes Policy, defended such

misconduct, took no disciplinary or remedial actions against the individual offenders, failed to

report the offenders to outside attorney disciplinary bodies, and failed to take reasonable steps to

ensure that prosecutors were properly trained and supervised in such areas and would not repeat

such behavior, including perpetuating a no-notes policy.

129.    Hynes and his top lieutenants, including Hynes himself, his counsel, Dino

Amoroso, his Chief of Investigations and former Chief of the Homicide Bureau, Michael

Vecchione, his Chief Assistant, Amy Feinstein, and numerous other ADAs and supervisors, have

admitted in sworn depositions in *Collins v. City of N.Y.*, 923 F.Supp.2d 462 (E.D.N.Y. 2013),

*Zahrey v. City of N.Y.,* No. 98 Civ. 4546, 2009 WL 54495 (S.D.N.Y. 2009), and other cases, that

Hynes and the KCDAO had no written *Brady* disclosure policy, no formal rules of behavior

governing how cases would be prosecuted and when (if ever) discipline for misconduct would be

warranted, and no formal disciplinary system for investigating or disciplining prosecutors who

violated the rights of criminal defendants.

130.    They have testified that the KCDAO's informal disciplinary "procedure" was for

Hynes himself to review every appellate reversal or judicial decision criticizing the conduct of a

prosecutor, to personally decide whether to initiate disciplinary investigations when he learned of

possible misconduct, and to decide, after such an investigation, whether to impose any form of

punishment.

131.    However, Hynes and his top lieutenants all confessed, under oath, that, while

dozens of court decisions finding misconduct of prosecutors in the prosecution of individual

criminal defendants, including *Brady* violations, knowing use of false or misleading evidence,

abuse of process, and witness coercion, were brought to Hynes's attention, they could not recall a

single instance in which Hynes directed that any disciplinary investigation be conducted, let alone that any discipline be imposed.

132.    Rather, KCDAO personnel records show that Hynes and his managerial staff almost invariably gave good evaluations, recommendations, promotions, and pay raises to prosecutors they knew had been alleged or found to have engaged in such  misconduct, recommended some of them for judgeships and others for awards, and ratified the misconduct by aggressively defending it even after it was exposed.

133.    The most egregious, and revealing, such case involved the prosecution and conviction of Jabbar Collins, in 1995, for murder.  Collins brought a fulsomely-documented and highly-publicized post-judgment motion, in 2006, proving *Brady* violations, including the withholding of recantation evidence, witness benefits, and witness coercion; the knowing presentation of false evidence and argument; and the misuse of secret, material witness and other court orders to coerce witnesses into giving false testimony—all practices similar to those at issue in the instant case.  The misconduct was principally by Collins' chief prosecutor, Michael Vecchione.  Vecchione was the chief of the Homicide Bureau during the Collins prosecution in 1994-95 and, by 2006, was Hynes' chief of investigations and a most well-known and influential trial prosecutor.

134.    Rather than investigate whether Collins' allegations were true, Hynes assigned several attorneys to defend Vecchione's conduct regardless of whether it was wrongful.  They presented in court a false, sworn affirmation by Vecchione denying allegations they knew, from their file, were true.  The motion was denied.

135.    In 2010, in connection with Collins' federal habeas corpus petition, the KCDAO was forced by Federal Judge Dora Irizarry to disclose extensive *Brady* material that it had withheld from the defense.  The disclosure revealed that Vecchione's sworn affirmation, used to cause Collins' state 440 motion to be denied, was itself perjurious.  Nevertheless, Hynes continued to support Vecchione and to declare he had done nothing wrong.  Ultimately, in granting Collins' petition, dismissing the underlying state indictment, and releasing him from custody, (now Chief) Judge Irizarry condemned Hynes and the KCDAO for defending the misconduct of Vecchione and other prosecutors in this matter, and Hynes' failure to properly train, supervise, and discipline his staff.

136.    Thereafter, Hynes promoted Vecchione further, and continually praised him, even though Hynes knew Vecchione had obtained court orders to coerce witnesses in the Collins and other cases through the use of perjurious affidavits, had submitted a false affirmation to cause Collins' 440 motion to be denied, and had been shown to have committed pervasive *Brady* violations in the Collins, and in other, cases.  The City ultimately paid Jabbar Collins $10 million in damages to settle Collins' civil rights lawsuit alleging that his damages had resulted from Hynes' unlawful policies tolerating or encouraging *Brady* violations and related misconduct.

137.    In this fashion, Hynes made clear that Vecchione's misconduct represented the policy of the KCDAO under Hynes' leadership.

138.    The Collins case was but one example of the Hynes Policy in action.  Records released by the KCDAO during civil litigation in the Collins case and other cases show that, during the Hynes era, while more than 200 prosecutors were disciplined for a variety of

24

"offenses," *none* were disciplined for trial-related misconduct affecting the due process rights of criminal defendants.

139.    Through his policy of deliberate indifference, Hynes created a permissive, "anything goes" atmosphere that directly led to additional such violations, including the violations in this case, all of which were reasonably foreseeable to him.

140.    Other cases show Hynes' policy of deliberate indifference to *Brady* violations, the knowing use of false or misleading testimony, the illegal coercion of false or unreliable witness testimony, and other misconduct in the prosecution of criminal cases.  These cases all have in common the existence of one or more of these types of misconduct and the failure, when such misconduct was exposed, to take any disciplinary or other remedial action to prevent similar types of misconduct in the future.  To the contrary, in each such case, the prosecutor involved was promoted, rewarded with salary increases, received positive evaluations, was recommended for a judgeship, or all of the above.

141.    For example, in *People v. Jackson*, 162 A.D.2d 470 (2d Dep't 1990), a conviction for arson-murder prosecuted by ADA Jon Besunder was overturned because the KCDAO had failed to disclose at trial a memorandum written by an assistant district attorney which contained evidence that the arson had been fabricated. Despite this, Hynes continued to employ Besunder as Deputy Chief of Homicide, and then promoted him to First Deputy Bureau Chief of the Homicide Bureau.  Following an extensive follow-up hearing, the trial court found that Besunder had given "disingenuous and evasive" testimony and had violated *Brady* by failing to disclose numerous pieces of evidence showing that the original fire had been accidental, that a subsequent fire had been deliberately set by firemen to enhance a future lawsuit by the widows of the five

dead firemen, and that the defendant's confession was false.  In 1993, in an equally scathing opinion, issued when Besunder was still Deputy Chief of Homicide, the Appellate Division affirmed this decision.  *People v. Jackson*, 154 Misc.2d 718 (Kings Cty. Sup. Ct. 1992), *aff'd*, 198 A.D.2d 301 (2d Dep't 1993).  Besunder testified in the Collins civil case that he was never disciplined for this conduct; rather, he continued in the KCDAO, in a supervisory position, throughout Hynes's tenure, including during the time of the prosecution of Plaintiff Joel Fowler.

142.    In the highly-publicized case of *People v. Marshall*, Nos. 9490/92 and 12592/92 (Kings Cnty.), ADA Vecchione and a subordinate, at three different trials, presented false testimony by a witness denying any benefits or cooperation agreement, even though Vecchione had personally signed a written cooperation agreement with this witness.  Like in the Collins case, Vecchione submitted a false affirmation, denying these facts, to cause the defendant's state post-conviction motion to be denied.  Like in the Collins case, when Vecchione's misconduct was exposed (in 2003) at a federal habeas corpus hearing (before Judge Korman), Hynes approved a deal to dispose of the case to protect Vecchione and, fully aware of Vecchione's perjury and *Brady* violations, continued to promote him and give him more and more responsibility in the KCDAO.  This occurred just a few years before Hynes authorized the cover-up of misconduct in the Collins case and the prosecution of Plaintiff Fowler.

143.    In *People v. Neptune*, 161 Misc.2d 781 (Kings Cnty. Sup. Ct. 1994), the court condemned the KCDAO for serving a subpoena on a witness on a day there would be no testimony "in . . . the hope that it would coerce the witness into consenting to be interviewed prior to testifying," found this to be "unprofessional conduct" under numerous prior court decisions outlawing the practice, suggested that in another case the remedy might be suppression

of testimony, and admonished the KCDAO that the "practice should not be replicated." *Id.* at

783.

144.    The deposition testimony of Vecchione's chief paralegal at the KCDAO,

however, established that, notwithstanding the court's decision and directive, the homicide

bureau continued to regularly use Office subpoenas issued to witnesses to compel them to appear

at the KCDAO for interrogation, and that, with Vecchione's knowledge and consent, this

paralegal regularly signed his name to "sworn" affidavits seeking court orders to arrest witnesses

or produce them from jail and had his false "signature" falsely notarized under "oath."   She

testified this was a widespread practice in the KCDAO known to prosecutors.

145.    In *People v. Russ*, a 17-year-old witness recanted her testimony during trial.   In

response, the KCDAO attempted to coerce her testimony by having her arrested and charged

with perjury, taken in handcuffs to the KCDAO, and threatened with as many as seven years in

prison, before being taken to Central Booking.   When she recanted her recantation, the charges

were dropped and she was released from custody.   Hynes defended and ratified this conduct in a

brief to the New York Court of Appeals—which ultimately found that the KCDAO had "illegally

coerced" the witness's testimony, in violation of the defendant's constitutional right to due

process of law and a fair trial.   79 N.Y.2d 173 (1992).

146.    In *People v. Sami Leka*, No. 2520/88, *rev'd sub nom. Leka v. Portuondo*, 257 F.3d

89 (2d Cir. 2001), Hynes's office convicted Sami Leka for murder.   Prosecutors violated *Brady*

by failing to disclose the identities and exculpatory statements of witnesses whose accounts

contradicted the testimony of the two main eyewitnesses and by obstructing defense efforts to

contact the witnesses once their identities were belatedly disclosed.   Hynes, in 1994, ratified his

27

subordinates' egregious illegal behavior. He wrote various government officials that he had personally looked into Leka's case and insisted that Leka had received a fair trial with his due process rights "amply and ably protected" and that he deserved to serve his life sentence. The Second Circuit later rejected Hynes's arguments that his prosecutors had done nothing wrong and found that the KCDAO's obstruction had prevented the defense from accessing a witness's testimony that would have had a "seismic impact" on the trial. *Leka*, 257 F.3d at 106. Leka later recovered $3.1 million in damages based upon a claim that Hynes' deliberate indifference to violations of *Brady* and failure to discipline prosecutors had resulted in his injuries.

147. In *People v. Cortez*, 149 Misc.2d 886 (Kings Cnty. Crim. Ct. 1990), the court dismissed a felony indictment after finding that the KCDAO shared responsibility with the NYPD for the latter's deliberate erasure of a potentially exculpatory 911 tape and other police communications which the defense had subpoenaed and which the KCDAO had an independent duty to preserve and disclose.

148. In *People v. Bond*, 95 N.Y.2d 840 (2000), the Court of Appeals vacated a murder conviction after finding that the KCDAO had failed to disclose that the only alleged eyewitness claiming the defendant had committed a murder had twice told police she hadn't seen the shooting at all. In addition, at a 440 hearing, evidence established that a prosecutor had illegally used a material witness order to detain a witness at his office and in a hotel room and coerce her into cooperating, and this witness had received various benefits that had not been disclosed.

149. In *Quezada v. Smith*, 624 F.3d 514 (2d Cir. 2010), the Second Circuit allowed a rarely-permitted second habeas petition to be filed based on new evidence that the KCDAO had used a material witness order to threaten a witness with 10 years' imprisonment if he refused to

testify and illegally detained him in a hotel room to coerce his testimony.  Subsequent discovery

caused by the federal court revealed the material witness order that the KCDAO had for years

denied (in sworn court filings and testimony) it had used.  Hynes did not discipline the two

prosecutors responsible, but had his office continue to fight the case until his successor, D.A.

Kenneth Thompson, agreed to dismiss it due to still additional evidence of a prosecutor's

perjury.  *See* Joaquin Sapien, *Trial and Error: A Man Convicted of Murder Wins Release, and*

*Questions of Responsibility Linger*, ProPublica (Sept. 15, 2015, 9:04 AM),

https://www.propublica.org/article/man-convicted-of-murder-wins-release-and-questions-of-

responsibility-linger.

 150.    In *People v. Ranta*, 203 A.D.2d 307 (2d Dep't 1994), two of Hynes's top

executives and trial attorneys withheld a tape showing that a key lineup identification had

resulted from blatant suggestion, and failed to disclose that court orders to produce two

informant-witnesses from Rikers Island had been misused by (the now infamous) Detectives

Scarcella and Chmil.  They had taken the two key cooperators to meet their girlfriends, for

meals, and possibly to obtain drugs, among other *Brady* violations.  When the trial judge learned

of these abuses, he demanded that the KCDAO investigate the detectives' misconduct, but it

never did, paving the way for Scarcella and Chmil to abuse the rights of numerous other criminal

defendants and cause countless wrongful convictions.  Hynes' office successfully opposed

Ranta's later 440 motion and federal habeas petition.  Only many years later, in 2013, after The

New York Times began its investigation into systematic misconduct by Scarcella, did Hynes

agree to vacate Ranta's conviction, conveniently ignoring that his office had known about the

misconduct all along and had successfully opposed Ranta's efforts, nearly 20 years earlier, to

29

overturn his false conviction.  Hynes and his chief assistant later successfully recommended one of the prosecutors for a judgeship.

     *151.*    In *People v. Pizzali*, 159 A.D.2d 652 (2d Dep't 1990), the court reversed a narcotics conviction and dismissed the indictment where the ADA had withheld until mid-trial 8 or 9 pieces of *Rosario* material which had direct bearing on the pretrial suppression hearing; some of this material directly contradicted the People's case.

     152.    In *People v. Inswood*, 180 A.D.2d 649 (2d Dep't 1992), the Appellate Division noted that the People, in violation of *Brady*, had failed to turn over information about exculpatory witnesses until virtually the end of trial, necessitating the trial judge reopening the trial to permit such witnesses to be called by the defense.

     153.    In *People v. Brown*, 187 A.D.2d 437 (2d Dep't 1992), the court noted that the trial prosecutor had been sanctioned at the May 1990 trial for his late disclosure of *Brady* material: an eyewitness's photo array identification of someone else as the shooter.   The prosecutor was later praised internally for his "comfortable ability to press a recalcitrant witness 'to the wall...'"

     154.    In *People v. Young*, 155 Misc.2d 878 Kings Cnty. Sup. Ct. 1992), a murder conviction was vacated after the court found that the same ADA as in the *Brown* case had presented "tailored" testimony designed to defeat the defendant's *Rosario* motion by obscuring the true source of the statement.  *Id*. at 882.

     155.    In *People v. Giddings*, 2/21/92 NYLJ, p. 25, col. 1, an ADA withheld a witness's prior inconsistent statement significant enough for the conviction to be vacated; while this ADA left the office, five years later Amy Feinstein, Hynes' chief assistant, recommended him for a judgeship, affirming the KCDAO had "no information that would reflect negatively on his

candidacy."

156.   In *People v. Barnes*, 200 A.D.2d 751 (2d Dep't 1994), the People made a late disclosure under *Brady* of a witness's recantation, but the court did not reverse because the defense was able to use the information on cross-examination.  Hynes's office ratified the misconduct by arguing the recantation wasn't *Brady* material at all because the witness supposedly "explained" that he had been frightened when he recanted.  Hynes later admitted, in his deposition, consistent with binding case law, that recantation evidence must be disclosed regardless of the witness's or the People's explanation for it.

157.   In *People v. Khadaidi*, 201 A.D.2d 585 (2d Dep't 1994), the Appellate Division reversed the defendant's 1991 conviction for first degree rape after the People had withheld the fourth and most critical page of an ADA's notes of an interview of the complainant which contradicted her story of what she did after the alleged assault.  (The court only reached the defendant's non-constitutional *Rosario* claim, but the ADA's error obviously also violated *Brady*.)

158.   In *People v. Bramble*, 207 A.D.2d 407 (2d Dep't 1994), the court affirmed the lower court's striking of an officer's testimony and granting of a suppression motion where the ADA had "failed to make any effort" to preserve police radio transmissions specifically requested by the defense and directly material to the issue of probable cause for the arrest.

159.   In *People v. Ramos*, 166 Misc.2d 515 (Kings Cnty. Sup. Ct. 1995), the court, in vacating a child abuse conviction on newly discovered evidence grounds, noted possible prosecutorial misconduct where two prosecutors obtained materially inconsistent information from the child witness but it was not disclosed by the assigned trial prosecutor, possibly because

of the inexcusable failure of the first two prosecutors to make him aware of it or his negligence in not learning about it.

160.    In *People v. Bruce*, 224 A.D.2d 438 (2d Dep't. 1996), the defendant's conviction was reversed due to the prosecutor's failure, conceded by the People, to produce police reports containing impeachment material (the court found a *Rosario* violation and did not reach the constitutional issue under *Brady*).

161.    In *People v. Perkins*, 227 A.D.2d 572 (2d Dep't 1996), the prosecutor delayed in disclosing a witness' cooperation agreement with the KCDAO until the day after the witness testified.  The Appellate Division did not reverse on the ground of insufficient prejudice.

162.    In *People v. Gourgue*, 239 A.D.2d 357 (2d Dep't 1997), the Appellate Division reversed the conviction because "the prosecutor incorporated factual statements made by the complainant into a list of proposed questions with the admitted intent of circumventing the *Rosario* rule by recording the statements in question form."  *Id*. at 357-8.

163.    In *People v. Cotton*, 242 A.D.2d 638 (2d Dep't 1997), the defendant was convicted of manslaughter.  The prosecutor, according to the Appellate Division's subsequent opinion reversing the conviction, gave a summation "premised on a fact that he kn[ew] to be false"; the court characterized the prosecutor's actions as a "blatant misrepresentation" the "misconduct was flagrant."   *Id.* at 638-9.  On appeal, Hynes's office defended all of this prosecutor's remarks as fair comment, and later recommended him for a judgeship.

164.    In *People v. Davis*, 709 N.Y.S.2d 345 (Kings Cnty. Sup. Ct. 2000), the KCDAO violated the court's order to disclose exculpatory evidence to the defense prior to indictment, resulting in the indictment being dismissed.  The court found that the assigned ADA, a highly

experienced homicide prosecutor, had received the court's order requiring disclosure, and discredited his denial—that is, it suggested he had testified falsely.

165.    In *People v. Calabria*, 94 N.Y.2d 519 (2000), the Court of Appeals reversed because of the trial prosecutor's misconduct in making it look like the defense was hiding photographic evidence, which the court had precluded, from the jury.  In addition, after the trial court gave a curative instruction and sternly admonished the prosecutor for conduct that was "absolutely contemptuous," he then brazenly defied the court by arguing that, "after [the People] knew about the photo, we got it. Oh, yeah, we got it. . . . [The People] gave it to you . . . [and] published those photos to you so you got to see the photos." *Id.* at 522.  Following the trial, the prosecutor was specifically praised by a supervisor for using his "skill" to win a weak case.

166.    In *People v. Jones*, 31 A.D.3d 666 (2d Dep't 2006), the Appellate Division reversed the conviction, after the People consented, due to the prosecutor's failure to correct false identification testimony.

167.    In *People v. Vielman*, 31 A.D.3d 674 (2d Dep't 2006), the Appellate Division reversed a murder conviction because the prosecutor's summation rested on a "false premise" and was a "blatant attempt to mislead the jury." *Id.* at 675.  The People conceded this misconduct and agreed to reversal of the conviction, but shortly after the reversal, Hynes promoted the same prosecutor.

168.    In *People v. Thompson*, 54 A.D.3d 975 (2d Dep't 2008), the same prosecutor as in the previous case suppressed *Brady* material indicating someone other than the defendant committed the crime.

169.    In every one of the aforementioned cases, the prosecutor either was praised in evaluations, promoted, or given a salary increase, following the court decision finding or suggesting misconduct; in none of the cases did Hynes authorize a disciplinary investigation, let alone impose any form of discipline.  There are many other cases in which, during the Hynes era, courts found similar misconduct, but where it is not as yet known by Plaintiff whether the prosecutor was disciplined.

170.    The systematic misconduct demonstrated by the preceding paragraphs was well known to and ratified by Hynes.  For example, Hynes admitted under oath that he knew about the KCDAO's practice of arresting witnesses on material witness orders, refusing to take them to court "forthwith" as required, and threatening them with imprisonment if they refused to meet with the ADAs, often holding them against their will at airport motels guarded by armed detectives.  The Second Circuit held in 2013 that prosecutors involved in this unconstitutional conduct could be held personally liable.  *Simon v. City of N.Y.*, 727 F.3d 167 (2d Cir. 2013).

171.    As noted above as well, Hynes testified that he was made personally aware of every court decision finding misconduct by one of his prosecutors and was personally responsible for deciding whether to investigate or discipline the prosecutor.  His failure in every such case to do so shows his policy of deliberate indifference to such behavior.

172.    Despite the history of misconduct of which Hynes was aware, he failed to require the office to have any employee handbook clarifying office policy with respect to compliance with *Brady*, avoiding or correcting false or misleading testimony or argument, and ensuring that witnesses were not illegally detained or coerced.

34

173.     In addition, Hynes failed to establish or publish practices, policies, or procedures

for investigating and disciplining prosecutors who had engaged in *Brady* violations and related

constitutional violations, in order to deter such violations.

174.     Hynes and his subordinates implemented his policy of deliberate indifference to

the types of constitutional violations that occurred in Plaintiff's case even though they knew:

      (a)     to a moral certainty that such policies, procedures, regulations, practices
and/or customs concern issues that regularly arise in the investigation and
prosecution of criminal cases;

      (b)     that such issues either present employees with difficult choices of the sort
that instruction, training and/or supervision will make less difficult or that
the need for further instruction, training, supervision and/or discipline was
demonstrated by a history of employees mishandling such situations as
well as the incentives that  employees have to make the wrong choice; and

      (c)     that the wrong choice by municipal employees concerning such issues will
frequently cause the deprivation of the constitutional rights of an accused
and cause him constitutional injury.

175.     They did so even though they were on notice that the City could be held liable for

their failure to adequately train, supervise, and/or discipline ADAs regarding their *Brady* and

related due process obligations.  *See, e.g., Walker v. City of N.Y.*, 974 F.2d 293 (2d Cir. 1992);

*Ramos v. City of N.Y.*, 285 A.D.2d 284, 301-07 (1st Dep't 2001).

176.     The aforesaid policies, procedures, regulations, practices, and/or customs of

Defendant THE CITY OF NEW YORK were collectively and individually a substantial factor in

bringing about the aforesaid violations of Plaintiff's rights under the Constitution and Laws of

the United States, in perpetuating those violations, and in causing his damages.

35

177.    By virtue of the foregoing, Defendant THE CITY OF NEW YORK is liable for having substantially and proximately caused the foregoing violations of Plaintiff's constitutional rights and his resultant injuries.

## SIXTH CAUSE OF ACTION
**(Negligent Hiring, Training and Supervision Under State Law; Against Defendant THE CITY OF NEW YORK)**

178.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1 through 177 of this Complaint.

179.    By virtue of the foregoing, Defendant THE CITY OF NEW YORK is liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the KCDAO and/or the NYPD with regard to their aforementioned duties.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

a.      For compensatory damages of not less than $10 million;

b.      For punitive damages against the individual Defendants of $5 million;

c.      For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. §1988 and to the inherent powers of this Court;

d.      For pre-judgment interest as allowed by law; and

e.      For such other and further relief as this Court may deem just and proper.

36

Dated:      New York, New York
             February 17, 2017

                              LAW OFFICES OF JOEL B. RUDIN, P.C.

                              By:_____ /s/ _____
                                Joel B. Rudin
                                Haran Tae
                                600 Fifth Avenue, 10th Floor
                                New York, New York 10020
                                (212) 752-7600
                                Email: jbrudin@rudinlaw.com

                              EMERY CELLI BRINCKERHOFF
                              & ABADY, LLP

                              By:_____
                                Earl S. Ward
                                Alison Frick
                                600 Fifth Avenue, 10th Floor
                                New York, New York 10020
                                (212) 763-5000
                                Email: eward@ecbalaw.com

                              *ATTORNEYS FOR PLAINTIFF*